UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

ANDRE'A MCDONALD

             Plaintiff,

      v.

INGERMAN MANAGEMENT COMPANY

             Defendant.

1:17-cv-12787-NLH-JS

OPINION

---

APPEARANCES:

LAURA C. MATTIACCI
CONSOLE MATTIACCI LAW, LLC
1525 LOCUST STREET
9TH FLOOR
PHILADELPHIA, PA 19102

CAREN NANCY GURMANKIN
STEPHEN G. CONSOLE
CONSOLE MATTIACCI LAW, LLC
110 MARTER AVE.
SUITE 105
MOORESTOWN, NJ 08057

FERNANDO I. RIVERA
CONSOLE MATTIACCI LAW, LLC
110 MARTER AVE. SUITE 502
MOORESTOWN, NJ 08057
    Attorneys for Plaintiff.

MARY CATHERINE GORDON
TARA L. HUMMA
BALLARD SPAHR
210 LAKE DRIVE EAST
SUITE 200
CHERRY HILL, NJ 08002

SHAINA ELISE HICKS
COZEN O'CONNOR
1650 MARKET STREET

SUITE 2800
PHILADELPHIA, PA 19103

    Attorneys for Defendant.

HILLMAN, District Judge

    This action concerns Plaintiff Andre'a McDonald's
employment at and subsequent departure from Defendant Ingerman
Management Company ("Ingerman").  Plaintiff has alleged that in
the course of her employment, she was subjected to a racist and
sexist hostile work environment and was terminated because of
her race, sex, marital status, and familial status.  This matter
comes before the Court on Defendant Ingerman's motion for
summary judgment, Defendant's motion in limine to exclude an
expert report submitted by Plaintiff, and Plaintiff's motion for
leave to file a sur-reply in opposition to Defendant's motion
for summary judgment.

    For the reasons that follow, the Court will partially grant
and partially deny Defendant's motion in limine.  The Court will
deny Defendant's motion for summary judgment and Plaintiff's
motion for leave to file a sur-reply.

                          BACKGROUND

    The Court takes its facts from the parties' briefing, the
material facts not in dispute, and the procedural history of
this case.  The facts relevant to this case are summarized
below.

                               2

Defendant Ingerman manages multiple housing communities in New Jersey, Pennsylvania, Maryland, and Delaware.  Plaintiff Andre'a McDonald ("McDonald") is a black female citizen of New Jersey.  McDonald began her employment at Ingerman as a Senior Property Manager in March 2017.  McDonald managed the Carpenter Hill and Pine Point communities on behalf of Ingerman.  McDonald has also stated that she managed the Heights at Medford property as well.

The majority of the properties McDonald managed at first were classified as "affordable housing," rather than "market rate" properties.  These classifications inform the financial and reporting requirements for occupants.  Generally, affordable housing properties impose more requirements on property managers and tenants.  In this position, McDonald was supervised by Euvaline Ellington and her negotiated salary was $52,000 per year.  The parties dispute McDonald's success in this role.

McDonald began managing a market rate property called "The Collings at the Lumberyard" ("the Collings") in August 2017. The parties dispute the reasoning behind this change in responsibility.  Ingerman asserts that this change was "to help [McDonald] succeed" and was "done for her benefit."  ECF No. 120-1, at ¶¶ 7, 11.  McDonald maintains that this change was "considered a promotion in terms of prestige, compensation and exposure to Defendant's corporate management team."  ECF No.

130-4, ¶¶ 7, 11.  McDonald's salary was increased to $60,000 per
year and she was supervised by Aaron Waltzer, Martin Josephs,
and Todd Stecker.  In her role as property manager, McDonald was
responsible for "overseeing all facets of property operation,"
including but not necessarily limited to "ensuring consistent
execution of revenue collection and expense management
practices, operation and contractual obligations, resident
relations policies and procedures, and employee hiring,
training, development and retention."

According to McDonald, this salary was substantially less
than a white Ingerman employee, Erica Boylan, who managed a
similar property called The Forge.  Ingerman acknowledges that
it paid Boylan $75,000 per year.  However, Ingerman states that
The Forge had at least 50% more units than The Collings and was
in a "lease up" period that required extra work by Boylan.
Ingerman also highlights the differences between The Forge and
The Collings as explanations for the difference in pay and
support staff.

Ingerman has a formal Employee Policy Manual that contains
an Equal Opportunity Statement, a Policy Against Workplace
Harassment and Discrimination, a policy regarding Sexual
Harassment, a section of reporting discrimination and
harassment, and a complaint procedure.  ECF No. 120-10.
McDonald was aware of this manual and knew that it contained a

procedure that required employees to report discrimination.  The
parties dispute whether all Ingerman employees follow the
policies and guidelines in this manual.

McDonald alleges that she experienced a number of incidents
that she describes as "race and sex discriminatory conduct."
These incidents include: hearing from Angela Biggs, Ingerman's
Director of Human Resources, that she feared losing her job
because she was a woman; being told Ingerman is an "all males'
club" in reference to the male executives engaging in sexual
relationships with subordinate female employees; observing male
executives dancing provocatively with female subordinates at a
leadership conference; hearing about sexual relations between
male executives and female subordinates at this leadership
conference; hearing a white employee tell a black female
employee that her "hair looks nappy"; observing differences in
allocation of support staff between white Property Managers and
herself; being told to "get over [her]self" by Josephs; being
told by a black Ingerman employee that "Ingerman likes to keep
the blacks working in the hood, and the whites working in the
suburbs"; being told by a black employee that "white employees
are treated better than black employees, but black employees are
expected to work ten times harder"; and becoming aware that
Ingerman's executives, including Mr. Ingerman and Mr. Josephs
have engaged in sexist and racist conduct towards other black

and female employees.  ECF No. 1, ¶ 18.  McDonald testified that the rumors about sexual relationships between Ingerman employees made her feel uncomfortable and nervous and forced her to be more reserved.

McDonald stated that Josephs raised his voice at her and directed her not to contact her predecessor at The Collings. According to McDonald, Josephs was also displeased with the flowers she had purchased for The Collings and denied her request for a receptionist.  McDonald alleges that when she requested a receptionist, Josephs asked whether she could do her job.  Though Ingerman did not hire a receptionist for The Collings, it did provide a phone service that was activated when McDonald was away from her desk or not on duty.  Ingerman states that The Collings was staffed according to the industry standard of 100 units per manager and maintenance technician.  Ingerman also states that neither McDonald's predecessor nor her successor have used the phone service Ingerman provided to McDonald at The Collings.

The parties agree that another black Ingerman employee, Shenica Smith, told McDonald "if I was white, all of the assistance I'm asking for, I would have received it."  According to Ingerman, Smith has stated that while she did make this statement, she was speaking out of frustration, regretted this comment, and did not believe the statement to be true.

McDonald also alleges that she received several hostile and accusatory emails from Dennis Regan, an Accounts Receivable Clerk, regarding issues her predecessor had left outstanding. Id. at ¶ 19.  Ingerman alleges that Regan would send similar emails to other property managers and generally did not use proper email etiquette.  According to McDonald, Smith was copied on the emails from Regan and observed that these emails were "double standards," "crazy," and "harassing."  According to McDonald, Smith also stated that Mr. Ingerman would say racist and sexist things at Ingerman executive meetings and alluded to what happened when a former Vice President of Human Resources, also a black woman, "shed light onto something that was completely wrong, racist, discriminatory, or sexist behavior." Smith has categorically denied making these statements and stated she never witnessed any inappropriate sexist or racist behavior from Ingerman or Josephs.

The parties dispute the extent to which McDonald disclosed her complaints to others at Ingerman.  McDonald testified that she spoke with Biggs about the "nappy hair" comment discussed above.  According to McDonald, Biggs responded "no harm, no foul" and did not take any action in response to this report. Ingerman states that McDonald testified she "could not go to Angela Biggs, the Director of Human Resources to make complaints."  ECF No. 120-1, ¶ 19.  McDonald claims she felt

this way "after she made a complaint of discrimination to Biggs
to no avail and after Biggs disclosed to Plaintiff that Biggs
herself feared losing her job due to her sex (female) . . ."
ECF No. 130-4, ¶ 19.  According to Ingerman, Biggs denies making
these statements.  The parties agree that McDonald could have
gone to James Andrew Bennett, the Vice President of Human
Resources, but did not do so.

Ingerman alleges that around September 2017, Waltzer,
Biggs, and McDonald met after McDonald had reported issues with
her performance.  McDonald stated she was not issued a formal
written warning by Waltzer, Bennett, or Biggs at this point or
any point before her termination.

In October 2017, McDonald ended her employment at Ingerman.
According to McDonald, when she met with Waltzer and Bennett in
October 2017, Bennett informed her of her immediate termination
and stated that "this is not working out."  Ingerman alleges
that the original purpose of this meeting was to issue McDonald
a performance warning.  Ingerman alleges that Waltzer explained
that McDonald's performance was lacking in many areas, including
leadership, management, multitasking, resident relations, and
communications.

McDonald alleges that when she requested an explanation for
her termination, Bennett responded that "I think a single person
without a family would be more suitable for the position."

McDonald is married with four children and had taken paid time off work to tend to her family.  Waltzer and Bennett deny making these statements.

Ingerman alleges that at this point "no formal employment determination had been made" and that Bennett asked McDonald to meet with him again.  This meeting did not occur and McDonald did not return to work at Ingerman.  According to McDonald, she had been offered a severance agreement and had returned her company keys and cell phone.  The parties dispute whether McDonald resigned or was terminated.

McDonald alleges that she was replaced by a white Property Manager, Autumn Becker, who earned a higher salary than McDonald had as the Property Manager of The Collings.  McDonald also alleges that a white married woman with children, Amanda Katzer, was considered to replace her but was ultimately not chosen as McDonald's replacement at The Collings because she had children.

Plaintiff filed this action on December 7, 2017, alleging two counts against Defendant: (1) violation of 42 U.S.C. § 1981 for discrimination and a hostile work environment and (2) violation of the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. § 10:5-1 et seq., for discrimination and hostile work environment on the basis of race, sex, marital status, and familial status.  This case was consolidated with another suit by an Ingerman employee, Marshelle Hightower, for purposes of

discovery and case management.  See <u>Hightower v. Ingerman</u>
<u>Management Co.</u>, No. 1:17-8025.[1]  Ingerman moved for summary
judgment on October 16, 2019.  At this time, Ingerman also made
a motion in limine to exclude an expert report and expert
testimony by Dr. Caren Goldberg.  On December 2, 2019, Plaintiff
made a motion for leave to file a sur-reply in further
opposition to Defendant's motion for summary judgment.  These
matters have been fully briefed and are ripe for adjudication.

ANALYSIS

A. Subject Matter Jurisdiction

    This Court has original federal question jurisdiction over
this case under 28 U.S.C. § 1331.  Plaintiff has alleged
violations of 42 U.S.C. § 1981.  The Court has supplemental
jurisdiction over any common law causes of action asserted by
Plaintiff under 28 U.S.C. § 1367 because these claims are part
of the same case or controversy.

B. Admissibility of Expert Testimony

    Federal Rule of Evidence 702 governs the admissibility of
expert testimony.  This rule states:

        If scientific, technical, or other specialized
        knowledge will assist the trier of fact to understand
        the evidence or to determine a fact in issue, a
        witness qualified as an expert by knowledge, skill,

---

[1] Marshelle Hightower served as a Human Resources Director for
Ingerman starting in September 2015.  Like McDonald, Hightower
has alleged that Ingerman violated 42 U.S.C. § 1981 and the New
Jersey Law Against Discrimination.

> experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if (1)
> the testimony is based upon sufficient facts or data,
> (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has
> applied the principles and methods reliably to the
> facts of the case.

Fed.R.Evid. 702.

The three requirements outlined in Rule 702 are referred to

as: (1) qualification, (2) reliability, and (3) fit.  Calhoun v.

Yamaha Motor Corp., U.S.A., 350 F.3d 316, 321 (3d Cir. 2003)

(citing Schneider v. Fried, 320 F.3d 396, 405 (3d Cir. 2003)).

The Third Circuit has explained these requirements as follows:

> First, the witness must be qualified to testify as an
> expert.  Qualification requires that the witness
> possess specialized expertise.  We have interpreted
> this requirement liberally, holding that a broad range
> of knowledge, skills, and training qualify an expert
> as such.  Second, the testimony must be reliable.  In
> other words, the expert's opinion must be based on the
> methods and procedures of science rather than on
> subjective belief or unsupported speculation; the
> expert must have good grounds for his or her belief.
> As assessment of the reliability of scientific
> evidence under Rule 702 requires a determination as to
> its scientific validity.  Third, the expert testimony
> must fit, meaning the expert's testimony must be
> relevant for the purposes of the case and must assist
> the trier of fact.

Id. (internal quotations and citations omitted).

Ingerman challenges the admissibility of Dr. Goldberg's

testimony on requirements two and three.  Ingerman alleges that

Goldberg's report is unreliable and will not aid the trier of

fact.

<u>Reliability</u>

The Court should consider the following factors in determining whether an expert's opinion is reliable: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship between the technique to methods which have been established to be reliable; (7) the qualification of the expert witness testifying based on the methodology; and (8) the non-judicial uses.  <u>Schneider</u>, 32 F.3d at 405.  These factors are "neither exhaustive nor applicable in every case."  <u>Pineda v. Ford Motor Co.</u>, 520 F.3d 237, 248 (3d Cir. 1996) (citing <u>Kumho Tire Co. Ltd. v. Carmichael</u>, 56 U.S. 137, 137 (1999) (other citations omitted)).

Generally, trial courts have "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  <u>Kumho Tire</u>, 526 U.S. at 152.  The Third Circuit has explained that "the standard for determining reliability 'is not that high,' [] even given the evidentiary gauntlet facing the proponent of expert testimony under Rule 702"  <u>In re TMI Litigation</u>, 193 F.3d 613, 665 (3d Cir. 1999).

<u>Fit</u>

12

To satisfy the third requirement of Rule 702, "a connection must exist '. . . between the expert opinion offered and the particular disputed factual issues in the case." McGarrigle v. Mercury Marine, 838 F.Supp.2d 282, 293 (D.N.J. 2011) (citing TMI Litigation, 193 F.3d at 670).  Put differently, in order for expert testimony to fit, "the scientific knowledge must be connected to the question at issue."  In Re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 734 (3d Cir. 1994).  As with reliability, the Third Circuit has held that the standard for fit is "not that high" but is "higher than bare relevance."  Id. at 745.

Having reviewed the requirements for expert testimony under Rule 702, the Court will now turn to Federal Rule of Evidence 704.  Rule 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed.R.Evid. 704(a).  However, Rule 704(a) does not allow an expert witness from rendering a legal opinion.  See Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 20206). A qualified expert

> may provide an opinion on whether a party's conduct or actions meet the underlying bases for an ultimate issue in a case (by, for example, testifying concerning whether certain acts in the abstract would be improper and/or inconsistent with a party's legal duties), but may not merely instruct the jury on the result to reach based on a party's specific conduct or actions (by, for example, stating that a party did need violate an applicable duty through certain actions).

Krys v. Aaron, 112 F.Supp.3d 181, 193 (D.N.J. 2015)
(excluding portions of an expert report where the expert
"reaches the specific conclusion that any Defendant acted
in compliance with and/or in violation of legal duties").

The Third Circuit has held that "the line between
admissible and inadmissible expert testimony as to the customs
and practices of a particular industry often becomes blurred
when the testimony concerns a party's compliance with customs
and practices that implicate legal duties.  Berckeley, 455 F.3d
at 218.

C. Ingerman's Motion in Limine

Goldberg's expert report contains three opinions, which are
briefly summarized as follows.  Goldberg's first opinion states
that Ingerman failed to investigate complaints in a manner
consistent with standard human resources practice and Ingerman's
own policy.  Goldberg's second opinion states that Ingerman's
practices indicate a tolerance for harassment.  Goldberg
specifies that in her opinion Ingerman does not provide thorough
investigations into complaints of harassment and that Ingerman's
leadership neither enforces its policies nor is held accountable
for failure to enforce these policies.  Lastly, Goldberg
contends that Ingerman's decisions to terminate Hightower and
McDonald run counter to standard human resources practices and
Ingerman's stated policy.

14

Ingerman alleges that Goldberg's report is unreliable for a number of reasons.  Ingerman alleges that Goldberg's report does not follow the case study method and does not correct for bias. Ingerman also alleges that Goldberg did not base her opinion on sufficient data because she only reviewed portions of the record.  Furthermore, Ingerman alleges that the data Goldberg did use relies on impermissible credibility determinations and misconstruing the factual record.  Ingerman further argues that Goldberg's report is unreliable because the she does not properly contextualize the standards and metrics she uses. Lastly, Ingerman attacks the reliability of Goldberg's report by asserting that her opinions are based in whole or in part on allegations made in the <u>Hightower</u> case, not the current one.

Next, Ingerman argues that Goldberg's opinions will not aid the trier of fact because her opinions relate to irrelevant issues and risk confusing the jury.  Ingerman also contends that Goldberg's opinions relate to facts that jurors are cable of understanding without an expert.  Finally, Ingerman contends that Goldberg's third opinion addresses only the <u>Hightower</u> case and does not reference McDonald.

McDonald responds that Golberg's report is reliable because Goldberg correctly applied the case study method and used appropriate evidence from the record.  McDonald contends that Ingerman has mischaracterized the record in criticizing the data

upon which Goldberg formed her opinion.  McDonald also asserts that Goldberg's report speaks to core issues in this case that will assist the trier of fact.  To support this argument, McDonald contends that Ingerman has misunderstood the issues in this case and that expert testimony on Ingerman's alleged actions is both necessary and appropriate.

The Court will partially grant and partially deny Ingerman's motion to strike Goldberg's testimony.[2]  Goldberg's testimony on standard human resources practice is admissible because her testimony meets the requirements under Rule of Evidence 702.  However, the Court will exclude Goldberg's testimony regarding whether Ingerman has violated its own policies or standard human resources practices.  Goldberg's testimony regarding whether Ingerman's practices indicate a tolerance for harassment will also be excluded.  The Court finds that these opinions are legal opinions that are not permissible under Rule 704(a).  See <u>Berckeley</u>, 455 F.3d at 217.

The Court agrees with Ingerman that other than the heading, Goldberg's third opinion does not mention McDonald or her termination.  Because there is no connection between the opinion

---

[2] The Court note that Judge Bumb in this district has already ruled on the admissibility of Goldberg's testimony in the <u>Hightower</u> case.  With the exception of opinion three, this ruling on admissibility is consistent with Judge Bumb's ruling.

offered and the particular factual issues in this case, the Court will exclude this portion of Goldberg's opinion.

In sum, the Court will exclude portions of Goldberg's expert report.  Specifically, the Court will exclude the portions of Opinions 1 and 2 that reaches specific conclusions that Ingerman has acted in compliance with or in violation of its legal duties.  The Court will exclude the entirety of Opinion 3.

D. McDonald's Motion to File a Sur-Reply

On December 2, 2 019, McDonald filed a Motion to File a Sur-Reply and attached, as an exhibit, a proposed sur-reply brief. McDonald alleges that this sur-reply is necessary to address new arguments Ingerman allegedly made for the first time in its reply brief.  Ingerman responded in opposition to this motion on December 23, 2019.

Local Rule of Civil Procedure 7.1(d) controls the filing of a sur-reply in this specific situation.  It states: "No sur-replies are permitted without permission of the Judge or Magistrate Judge to whom the case is assigned."  Loc. R. Civ. P. 7.1(d)(6).  McDonald did not file a supporting brief in violation of Local Rule 7.1(d)(1).  See Loc. R. Civ. P. 7.1(d)(1) ("No application will be heard unless the moving papers and a brief . . . are filed with the Clerk . . . . The brief shall be separate document for submission to the Court . .

17

.").  Notwithstanding this failure to file a supporting brief
pursuant to local rules, the Court finds that McDonald's
proposed sur-reply consists substantially of arguments
originally made in her opposition brief to Defendant's motion
for summary judgment and does not highlight any exceptional
circumstances warranting the filing of a sur-reply.

The Court will deny McDonald's motion for leave to file a
sur-reply.

E. Summary Judgment Standard

Summary judgment is appropriate when the Court is satisfied
that "'the pleadings, depositions, answers to interrogatories,
and admissions on file, together with the affidavits if any,' .
. . demonstrate the absence of a genuine issue of material fact"
and that the moving party is entitled to a judgment as a matter
of law.  Celotex, 477 U.S. at 322-23 (citing Fed. R. Civ. P.
56).

An issue is "genuine" if it is supported by evidence such
that a reasonable jury could return a verdict in the nonmoving
party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986).  A fact is "material" if, under the governing
substantive law, a dispute about the fact might affect the
outcome of the suit.  Id.  "In considering a motion for summary
judgment, a district court may not make credibility
determinations or engage in any weighing of the evidence;

18

instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (citing Anderson, 477 U.S. at 255).

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.").

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324. A "party opposing summary judgment 'may not rest upon the mere allegations or denials of the . . . pleading[s].'" Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). For "the non-moving party[] to prevail, [that party] must 'make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Cooper v. Sniezek, 418 F. App'x 56, 58 (3d Cir. 2011) (citing Celotex, 477 U.S. at 322).

Thus, to withstand a properly supported motion for summary
judgment, the nonmoving party must identify specific facts and
affirmative evidence that contradict those offered by the moving
party.  Anderson, 477 U.S. at 257.

   F. Ingerman's Motion for Summary Judgment

     McDonald has brought claims of hostile work environment and
discrimination under 42 U.S.C. § 1981 and the New Jersey Law
Against Discrimination.  Section 1981 employment claims are
"analyzed using the same framework as for Title VII and NJLAD
Claims."  Wise v. Estes, No. 10-481, 2010 WL 2757273, at *4
(D.N.J. July 6, 2010).

   1. McDonald's Hostile Work Environment Claims under Section
      1981 and the NJLAD

     For her claim of a hostile work environment under the NJLAD
and Section 1981, McDonald must show (1) she suffered
intentional discrimination because of his or her sex, race,
familial status, or marital status; (2) the discrimination was
severe or pervasive; (3) the discrimination detrimentally
affected the plaintiff; (4) the discrimination would
detrimentally affect a reasonable person in like circumstances;
and (5) the existence of respondeat superior liability.  Mandel
v. M& Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013)
(citing Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006)).
The first four elements establish a hostile work environment,

while the fifth element focuses on employer liability.  Hudson
v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104 (3d
Cir. 2009).

     To determine if a work environment is hostile or abusive,
courts look at the totality of the circumstances, which includes
"the frequency of the discriminatory conduct; its severity;
whether it is physically threatening or humiliating, or a mere
offensive utterance, and whether it unreasonably interferes with
an employee's work performance.  Mandel, 706 F.3d at 168.  The
"sine qua non of a hostile work environment claim is a 'work
place . . . permeated with discriminatory intimidation,
ridicule, and insult, that is sufficiently severe or pervasive
to alter the conditions of the victim's employment and create an
abusive work environment.'" McKinnon v. Gonzales, 642, F.Supp.2d
410, 421 (D.N.J. 2009) (quoting Nat'l R.R. Passenger Corp. v.
Morgan, 536 U.S. 101, 116 (2002)); see also Fitzgerald v. Shore
Memorial Hosp., 92 F.Supp.3d 214, 240 (D.N.J. 2015).

     In Caver v. City of Trenton, the Third Circuit held that an
African American police officer had not established his claims
of a hostile work environment where the comments complained of
were neither about nor directed at him.  Caver v. City of
Trenton, 420 F.3d 243, 263 (3d Cir. 2005).  "[B]oth the Supreme
Court and the Third Circuit have been clear that 'offhand
comments, and isolated incidents (unless extremely serious) are

not sufficient" to establish a hostile work environment.  Nuness
v. Simon & Schuster, Inc., 221 F.Supp.3d 596, 601 (D.N.J. 2016)
(quoting Faragher v. City of Boca Raton, 524 U.S. 775, 778
(1998)).  The Supreme Court has also held that discrimination
laws such as the NJLAD are not intended to be a "general
civility code" for conduct in the workplace.  Oncale v.
Sundowner Offshore Servs., Inc.,, 523 U.S. 75, 80 (1998).

While comments to or about a third party are insufficient
to form the basis of a hostile work environment claim, they are
not wholly irrelevant.  The Third Circuit also held in Caver
that offhand comments could be used as evidence in determining
whether facially neutral conduct was actually based on an
employee's race.  See Caver, 420 F.3d at 263-64.

Generally, an employer is vicariously liable for the
conduct of a supervisor where the supervisor acted within the
scope of his or her employment.  Wilson v. New Jersey, No. 16-
7915, 2019 WL 5485395, at *11 (D.N.J. Oct. 25, 2019).  An
employer can be held liable for a supervisor's creation of a
hostile work environment in three cases: (1) the employer grants
the supervisor the authority to control the working environment
and the supervisor abuses that authority to create a hostile
work environment[;]" (2) where "the employer ha[s] actual or
constructive notice of the harassment[;]" or (3) where, in the
absence of actual or constructive notice, "the employer

22

negligently or recklessly failed to have an explicit policy that bans sexual harassment and that provides an effective procedure for the prompt investigation and remediation of such claims." Lehmann v. Toys 'R' Us, 132 N.J. 587, 624-25 (N.J. 1993).

An employer is liable for a co-worker's harassing conduct only if 'management-level employees knew, or in the exercise of reasonable care should have known, about the campaign of harassment.'" Nuness, 221 F.Supp.3d at 603-04 (quoting Herman v. Coastal Corp., 348 N.J.Super. 1, 24-25 (N.J. Super. Ct. App. Div. 2002)).

Ingerman asserts that McDonald has not proven a prima facie case of a hostile work environment because the incidents McDonald describes were not "severe or pervasive," did not alter the conditions of employment, and were in most cases not directed at McDonald.  Ingerman also asserts that McDonald cannot establish respondeat superior liability for Josephs' actions. ECF No. 120-2, at 16 (citing Greer v. Mondelez Global, Inc., 590 Fed. Appx. 170, 174-75 (3d Cir. 2014)).

McDonald argues that Ingerman has mischaracterized her evidence as "gossip" or "rumors."  According to McDonald, second hand accounts from other black Ingerman employees are evidence that her perception of Ingerman as a hostile work environment was reasonable.  McDonald further argues that a plaintiff-employee may advance claims of a hostile work environment in

cases where the plaintiff was not the direct or intended target of the offensive or discriminatory conduct.  ECF No. 130, at 13 (citing Lehmann, 132 N.J. at 610-611).  McDonald also emphasizes that many of her allegations concern her supervisor, Josephs, and his behavior, and that she personally witnessed and took offense to a white employee's comment about a black female employee's hair.  McDonald emphasizes her physical proximity to Ingerman Executives and their provocative behavior at the conference as evidence of a hostile work environment.  McDonald also highlights that Bennett agreed that if the events occurred as she describes them, they would have constituted a hostile work environment.  Lastly, McDonald asserts that she can establish respondeat superior liability for Josephs' actions because he is her supervisor and Ingerman failed to deter harassment or enforce its human resources policies.

The Court finds that there is a genuine dispute of material fact regarding McDonald's hostile work environment claims. McDonald has introduced evidence such that a reasonable jury could find that the incidents she described were pervasive enough to alter the work environment at Ingerman.  The Court agrees with McDonald that the comments from other Ingerman employees regarding discrimination at Ingerman could lead a reasonable jury to find that facially neutral conduct by McDonald's supervisors was motivated by race.  McDonald's

descriptions of her supervisors' behavior while at a work event, the "nappy hair" comment she overheard, and Josephs' comments to her during their meetings, and the comments she alleges were made at the October 2017 could lead a reasonable jury to find that this conduct interfered with McDonald's work performance.

The Court finds that McDonald can establish a material question of genuine fact regarding respondeat superior liability for her supervisors' actions.  Much of the conduct McDonald alleges as the basis of her hostile work environment claim concerns Josephs, a supervisor with the authority to control the working environment.  A genuine dispute over whether Josephs abused this authority to create a hostile work environment exists.  McDonald also demonstrated that she brought at least one complaint of harassment and discrimination to the attention of Ingerman's Director of Human Resources to no avail.  McDonald also introduced evidence that Ingerman did not take action to address Dennis Regan's email communications, despite Ingerman's knowledge that he generally did not follow proper email etiquette and sent harassing emails to multiple employees, including McDonald.  The Court finds that Ingerman's alleged failure to take action in this instances could lead a reasonable jury to find respondeat superior liability.

The Court will deny Ingerman's motion for summary judgment with respect to McDonald's hostile work environment claims.

25

2. McDonald's Discrimination Claim

Courts analyze claims for race and sex discrimination under the McDonnell Douglas burden-shifting framework.  See Stewart v. Rutgers Univ., 120 F.3d 426, 432 (3d Cir. 1997) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1972)).  This framework has three basic steps.  First, the plaintiff must put forward a prima facie case of race or sex discrimination by a preponderance of the evidence.  Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003).  If a plaintiff makes a prima facie case of discrimination, the analysis continues to the second step.  At this step, the burden shifts to the defendant to provide "a legitimate, nondiscriminatory reason for its actions."  Tucker v. Thomas Jefferson Univ., 484 F.App'x 710, 712 (3d Cir. 2012).  If the defendant succeeds, the analysis proceeds to the third step.  At this stage, "the inference of discrimination drops and the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely a pretext for intentional discrimination."  Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008).  If each side meets its burden at each stage, then summary judgment is inappropriate.  Whishkin v. Potter, 476 F.3d 180, 185 (3d Cir. 2007).  Each step of this framework is its own separate analysis.  Hicks v. New Jersey Department of Corrections, et al., No. 3:16-cv-00927, 2019 WL 5587324, at * 4 (D.N.J. Oct. 30, 2019).

Step One: McDonald's Prima Facie Case

The prima facie case "serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons" for an adverse employment action.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-54 (assessing a plaintiff's claim that she was denied a promotion and terminated as a result of sex discrimination).  The prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors."  Id. (quoting Furnco Construction Corp. v. Waters, 438 U.S. 567, 577 (1978)).

For her claim of discrimination under the NJLAD and Section 1981, McDonald must show: "(1) she belongs to a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances support an inference of unlawful discrimination."  Hicks, 2019 WL 5587324 at *4 (citing In re Tribune Media Co., 902 F.3d 384, 402 (3d Cir. 2018)).  The elements of the prima facie case are not meant to be "applied woodenly, but must rather be tailored flexibly to fit the circumstances of each type of illegal discrimination."  Geraci v. Moody-Tottrup Int'l, 82 F.3d 578, 581 (3d Cir. 1996). The Supreme Court has held that this "burden of establishing a

prima facie case of disparate treatment is not onerous."
Burdine, 450 U.S. at 253.

If non-members of the protected class receive more favorable treatment than plaintiff under similar circumstances, these circumstances support an inference of unlawful discrimination. Hicks, 2019 WL 5587324, at * 4 (citing Sarullo, 352 F.3d at 797 n 7). Hiring someone not in the protected class as a replacement is also a common circumstance giving rise to an inference of unlawful discrimination. May v. PNC Bank, No. 18-2933, 2020 WL 370043, at *7 (E.D. Pa. Jan. 22, 2020).

Ingerman does not dispute that McDonald is a member of a protected class. Ingerman similarly does not contest that McDonald was qualified for her position. The parties agree that McDonald was separated from her employment, but do not agree that McDonald was terminated. Ingerman maintains that McDonald resigned her position following the October 2017 meeting. McDonald argues that she was terminated during the October 2017 meeting.

Ingerman asserts that even if McDonald was terminated, the circumstances surrounding this adverse employment action do not give rise to an inference of discrimination. Ingerman argues that McDonald has only identified one other Ingerman employee, Erica Boylan, who she believes was paid more than her and received more staffing support. Ingerman argues that this is

insufficient to support an inference of racial discrimination
because Boylan did not work under the same circumstances as
McDonald.  Ingerman highlights that Boylan, who is also a woman,
managed more housing units than McDonald and Boylan's properties
were in a lease-up stage, which required additional support.
Ingerman further alleges that these circumstances do not support
an inference of discrimination because both McDonald's
predecessor and successor were also women.  Ingerman also points
out that McDonald's her successor was married.  Furthermore,
Ingerman asserts that because it offered assistance to McDonald
in the form of an answering service, the circumstances do not
support an inference of discrimination.

McDonald argues that she has met her burden of establishing
a prima facie case of race, sex, familial status, and marital
status discrimination.  McDonald alleges that she only needs to
show a "factual scenario [that] is compatible with
discriminatory intent—i.e. that discrimination could be a reason
for the employer's action."  ECF No. 130, at 24 (citing Zive v.
Stanley Roberts Inc., 867 A.3d 1133, 1139 (N.J. 2005)).
McDonald argues she does not need to show that she was replaced
by someone outside of her protected class to satisfy the fourth
prong on her prima facie case.  Instead, McDonald asserts there
are multiple ways to satisfy this element.  McDonald also
emphasizes that her successor was paid at a starting salary of

$70,000, an $8,000 increase from McDonald's last salary. Furthermore, McDonald asserts that Waltzer adopted the comments Bennett made at the October 2017 meeting about a single person being better suited for McDonald's position. According to McDonald, this is sufficient to support an inference of discrimination.

The Court finds that there is a genuine dispute of material fact over whether McDonald was terminated or resigned her position. Emails circulated days before the October 2017 show that Waltzer had previously stated that Ingerman "need[s] to find someone ASAP" with regards to McDonald's handling of a maintenance request. ECF No. 130-3, ¶ 46. Bennett had also sent an email discussing whether McDonald would "accept[] a modest severance amount to move on." Id. at ¶ 48. Emails following this meeting also bring into question whether McDonald resigned her position or had been terminated, what, if any, severance was being offered, and general offboarding all support the conclusion that there is a genuine dispute of material fact.

The Court further finds that McDonald has introduced enough evidence to establish a prima facie case of discrimination at this stage. Recognizing that this is not an onerous burden, the Court finds that the acts McDonald describes, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. Ingerman's explanations for these

acts will be discussed in the next step of the <u>McDonnel Douglas,</u> analysis.

<u>Step Two: Ingerman's Legitimate, Nondiscriminatory Reasons for its Actions</u>

At this stage, defendants need only "introduce[e] evidence which, taken as true, would permit the conclusion that was a nondiscriminatory reason for the unfavorable employment decision." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994). A defendant only has the burden of production, not the burden of persuasion at this stage and "need not prove that the tender reason *actually* motivated its behavior." <u>Id.</u> (emphasis in original). The Third Circuit has characterized this burden is "relatively light" <u>Id.</u> at 762

Ingerman asserts that it has set forth a non-discriminatory reasons for McDonald's pay and support staff. According to Ingerman, both McDonald's pay and the staffing at The Collings was standard for properties not in a lease-up period. Ingerman asserts that this model of staffing was applied at The Collings both before and after McDonald's tenure as property manager. Ingerman attributes any differences in McDonald's pay and Boylan's pay to differences in their responsibilities and the fact that Boylan's property was in a leasing-up period. Ingerman also highlights that the reason for the October 2017 meeting was to discuss McDonald's performance. Ingerman

31

maintains that this is consistent with Ingerman's decision to transfer McDonald from her other properties to The Collings in hopes that her performance would improve.

McDonald argues that because Ingerman does not concede that it terminated her, Ingerman cannot offer a non-discriminatory reason for terminating her.  McDonald asserts that any reason Ingerman offers at this stage would be a post-hoc, fabricated reason for terminating her.  McDonald asserts that before the termination meeting, no one mentioned terminating her. According to McDonald, Bennett stated he would not have endorsed terminating in October 2017 and that Bennett and Waltzer have stated that her performance did not warrant termination.

Because this burden is "relatively light," Fuentes, 32 F.3d at 762, the Court finds that Ingerman has met its burden at this step of the analysis.  Ingerman has offered a non-discriminatory explanation for why Boylan was paid more than McDonald and has stated a non-discriminatory reasons for McDonald's separation from her employment.

Step Three: The Pretextual Nature of Ingerman's Explanation

At this step, a plaintiff must "convince the fact finder 'both that the reason was false, and that discrimination was the real reason." Fuentes, 32 F.3d at 763 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (emphasis in original)). The analysis "focuses on whether there is sufficient evidence

from which a jury could conclude that the purported reasons for defendant's adverse employment actions were in actuality a pretext for intentional race discrimination.  Jones v. Sch. Dist. of Phila., 198 F.3d 403, 413 (3d Cir. 1999).  A plaintiff can meet his or her burden in several ways: showing that defendant had previously discriminated against the plaintiff, that the defendant had previously discriminated against other persons with the plaintiff's protected class, or that the defendant has treated more favorably similarly situated persons not within the protected class."  See Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645 (3d Cir. 1998).

Ingerman argues that for the same reasons McDonald failed to show that the circumstances support an inference of discrimination in step one, she cannot meet her burden at this stage.  McDonald argues that the Court need not reach this step in the McDonnel Douglas analysis because Ingerman did not meet its burden in step two.

The Court finds that there is sufficient evidence from which a reasonable jury could conclude that Ingerman's purported reasons for the adverse employment action against McDonald were a pretext for intentional discrimination.  McDonald has shown that there is a genuine dispute of material fact by introducing

evidence that Ingerman treated Becker, a similarly situated person not within McDonald's protected class, more favorably.[3]

Though Ingerman has offered a partial non-discriminatory explanation for McDonald's lower pay as compared to Boylan, a reasonable jury could still find that this explanation was pretextual and McDonald's pay and alleged treatment were the result of discrimination.  Ingerman's purported reasons for McDonald's separation from her employment are undercut by McDonald's claims regarding her successor's increased pay.

Furthermore, a reasonable jury could also determine that Ingerman's purported reasons for McDonald's separation from her employment were motivated by race, not her performance as Ingerman has stated. Ingerman alleges that the purpose for the October 2017 meeting was to discuss McDonald's performance. Ingerman also states that this meeting was consistent with its decision to transfer McDonald to The Collings to improve her performance.  However, McDonald has shown that her transfer to The Collings was accompanied by a pay raise of $8,000, which is seemingly inconsistent with McDonald's alleged poor performance. These inconsistencies demonstrate that there is a genuine

---

[3] The Court notes that Becker is a white married woman with no children.  Though McDonald and Becker are both members of some protected classes, their race and familial status differ.

dispute of material fact regarding McDonald's departure from Ingerman and her allegations of discrimination.

The Court will deny Ingerman's motion for summary judgment with respect to these discrimination claims.

CONCLUSION

For the reasons stated above, the Court will partially grant and partially deny Defendant's motion to exclude the expert report. The Court will deny Defendant's motion for summary judgment and Plaintiff's motion for leave to file a sur-reply.

An appropriate Order will be entered.


Date: September 25, 2020          s/ Noel L. Hillman
At Camden, New Jersey            NOEL L. HILLMAN, U.S.D.J.